Mark E. Merin (State Bar No. 043849)
Paul H. Masuhara (State Bar No. 289805)
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone:     (916) 443-6911
Facsimile:     (916) 447-8336
E-Mail:        mark@markmerin.com
               paul@markmerin.com

Yoshinori H. T. Himel (State Bar No. 066194)
372 Florin Road #191
Sacramento, California 95831
Telephone:     (916) 420-9865
Facsimile:     (916) 229-9922
E-Mail:        YHimel@LawRonin.com

Attorneys for Plaintiff
TULE LAKE COMMITTEE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| TULE LAKE COMMITTEE, | Case No. |
| Plaintiff, | **VERIFIED COMPLAINT FOR VIOLATION OF NATIONAL HISTORIC PRESERVATION ACT (§§ 106, 110), ADMINISTRATIVE PROCEDURES ACT, FEDERAL LAND PATENT, RALPH M. BROWN ACT, AND CIVIL RIGHTS LAWS** |
| vs. | |
| FEDERAL AVIATION ADMINISTRATION, CITY OF TULELAKE, CALIFORNIA, CITY COUNCIL OF THE CITY OF TULELAKE, BILL G. FOLLIS, JUDY COBB, PHIL FOLLIS, JACK SHADWICK, RAMONA ROSIERE, and MODOC NATION fka MODOC TRIBE OF OKLAHOMA, | **JURY TRIAL DEMANDED** |
| Defendants. | |

The Tule Lake Committee, plaintiff, alleges:

## JURISDICTION; VENUE

1.     Subject matter jurisdiction is granted to This Honorable Court by 28 U.S.C. § 1331 because this action raises federal questions, by 28 U.S.C. § 1343 because of civil rights claims, by 28 U.S.C. § 1361 to compel an agency to perform mandatory duties, and by 28 U.S.C. § 1367 because of state-law claims forming part of the same case or controversy.

1

2.    The jurisdictional bar of federal governmental sovereign immunity is waived by the Administrative Procedures Act, 5 U.S.C. §§ 701 to 706. The jurisdictional bar of tribal sovereign immunity is inapplicable because of the immovable property rule. The jurisdictional bar of tribal sovereign immunity is inapplicable because of *Ex parte Young*, 209 U.S. 123 (1908).

3.    Under 28 U.S.C. § 1391, venue lies in the Eastern District of California because the historic property that is the subject of the action is situated in Modoc County, California; because a substantial part of the events and omissions giving rise to the claim occurred in Siskiyou County, California; and because the defendant federal agency is subject to this Court's personal jurisdiction.

## PARTIES

4.    Plaintiff, the Tule Lake Committee, was incorporated as a California non-profit public benefit corporation in 1981 to represent the survivors and descendants of those incarcerated at a concentration camp known as the Tule Lake Relocation Center (later a Segregation Center and later a Department of Justice alien internment camp) during World War II. The Committee is tax-exempt under Internal Revenue Code § 501(c)(3). The Committee's purposes are (a) to educate the general public about the false imprisonment of over 120,000 men, women, and children of Japanese ancestry into ten concentration camps in the United States in the 1940s; (b) to recognize the unique role of the Tule Lake camp, which became a segregation center incarcerating inmates from all ten camps who dissented from their false imprisonment and who, for expressing their views, were unjustly stigmatized as "disloyal"; and (c) to preserve the history and experiences of the inmates of the Tule Lake Segregation Center and their struggles to cope with their isolation under harsh conditions. Tule Lake Committee supporters include individuals with a deep connection to the historic importance of the Tule Lake Segregation Center. The Tule Lake Committee brings this complaint on behalf of its supporters and others similarly situated, who are too numerous to be named and brought to this Court as plaintiffs.

5.    Plaintiff has standing as the representative of survivors of the Tule Lake concentration camp and descendants of persons incarcerated there, and as the representative of other interested members of a worldwide public.

6.    Defendant Federal Aviation Administration is an agency of the United States of America within the U.S. Department of Transportation.

2

7.     Defendant City of Tulelake ("City") is a general-law city incorporated March 1, 1937, and located in Siskiyou County, California. City acquired the fee interest in 359 acres of historic concentration camp property without charge under a 1951 Patent by the Department of the Interior. A copy of the Patent is Exhibit A hereto.

8.     Defendant Modoc Nation, fka Modoc Tribe of Oklahoma ("Tribe") is an Indian Tribe headquartered in the town of Miami, in northeastern Oklahoma.

9.     Defendant Bill G. Follis is Tribe's Chief and a member of Tribe's Elected Council. He is sued in his official capacity.

10.     Defendant Judy Cobb is Tribe's 2nd Chief and a member of Tribe's Elected Council. She is sued in her official capacity.

11.     Defendant Phil Follis is Tribe's 1st Councilman and a member of Tribe's Elected Council. He is sued in his official capacity.

12.     Defendant Jack Shadwick is Tribe's 2nd Councilman and a member of Tribe's Elected Council. He is sued in his official capacity.

13.     Defendant Ramona Rosiere is Tribe's Secretary/Treasurer and a member of Tribe's Elected Council. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

### THE SITE'S HISTORICAL BACKGROUND AND SIGNIFICANCE

14.     Among the ten American concentration camps (officially, "War Relocation Centers") created during World War II to imprison innocent citizens and immigrants for no reason except their Japanese ancestry, Tule Lake is unique as the site where 12,000 American citizens were imprisoned for their American act of dissenting from governmental injustice. In 1943, a misconceived and ineptly administered questionnaire caused thousands of the 120,000 incarcerated Japanese Americans to protest their false imprisonment by the federal government. For their peaceful dissent, the government demonized them and punished them with segregation into a maximum-security prison camp. That camp, Tule Lake, became the largest of the ten concentration camps with over 18,000 souls. The government then maneuvered thousands of citizens into giving up their U.S. citizenship, and planned to deport them. These events give Tule Lake unparalleled national and international significance.

3

15.     When the United States considered siting its concentration camp in the Tule Lake basin, the local settlers called the area "a white man's country," according to the "Report on Attitude of Citizens and Officials in Tule Lake Area and Klamath County, Oregon, to Japanese Reception Center near Tulelake, Calif.," by George Dean, War Relocation Authority, April 26, 1942. "They intend to keep it so and are depressed that the Japanese are coming in." The then Mayor of Tulelake said, "This is a white man's country and we want it that way; the Japs [sic] will drive white labor out; this will get the reputation as 'a Jap [sic] country' and white labor won't come here." The WRA report found sentiment for racial segregation of people of Japanese descent in farm employment, in schools, and in homesteading. "[T]he residents of the Tule Lake basin, now reconciled to the establishment of the reception center[,] insist that the Japanese be removed from the area after the war."

16.     After the war, the U.S. Bureau of Reclamation's Klamath Project made lands in the Tule Lake basin available for homesteading by white veterans with farming experience. The Japanese American community included veterans of WW1, and of WW2's 442nd Regimental Combat Team; many Tule Lake prisoners grew up on farms; and the prisoners operated a farm adjacent to the camp that fed WRA concentration camps nationwide. But, between the establishment of the Klamath Project and the homestead drawing in December 1946, nobody of Japanese ancestry was ever awarded a homestead on the Klamath Project.

17.     More than 331 persons died in the Tule Lake camp—some by suicide or murder, some from poor medical care, and some from depression and stress. Many who died were babies. Many who died were elderly and infirm.

18.     With the war's end, Japanese Americans sought to return to their homes in a country that had directed policies of racial hostility toward them.

19.     In 1951 the federal government, oblivious to its own Jim Crow racial policies and the concentration camp site's historic significance, granted 359 acres of camp land to City to use as an airport. The grant was made by the Patent reproduced as Exhibit A. As the patent recites, its authority was the Federal Airport Act of 1946, Pub. L. No. 377, 60 Stat. 170 (May 13, 1946). Under Section 16 of that Act the Administrator of Civil Aeronautics (whose current successor in function is the FAA Administrator) was responsible for initiating the conveyance, which was then executed by the

4

Department of the Interior. The land patented to City covered a large portion of the developed area of the camp, and two-thirds of the barracks area where people were forced to live.

20.     In further derogation of the emotional, historical and spiritual meaning the land has to Japanese Americans and the site's significance in American history, homesteaders working on postwar construction bulldozed the concentration camp's cemetery, which lay near the edge of the airport grant. The cemetery contents were used to fill drainage ditches for the Tulelake Municipal Airport.

21.     The County of Modoc became the Tulelake Municipal Airport's sponsor. "Sponsor" was defined in the Federal Airport Act of 1946, for example, as "any public agency which … submits to the Administrator, in accordance with this Act, an application for a grant of funds for airport development."

22.     In the 1950s and 1960s, the African American-led civil rights movement challenged racial discrimination in the nation's laws and institutions including federally-assisted programs, schools, workplaces, public accommodations, housing, and voting. The movement's effects in the legal system included *Brown v. Board of Education,* the Civil Rights Act of 1964, the Voting Rights Act of 1965, and the Civil Rights Act of 1968. The movement's example encouraged Japanese Americans to challenge the injustices of their wartime incarceration.

23.     The challenges to the injustices of the incarceration resulted in the Civil Liberties Act of 1988. In that Act, Congress found that the World War II incarceration resulted not from genuine national security reasons but from "racial prejudice, wartime hysteria, and a failure of political leadership." Pub. L. No. 100-383 (Aug. 10, 1988), 102 Stat. 903, § 2(a). With the Civil Liberties Act came individual Presidential letters of apology, symbolic redress payments, and promises to educate the nation about the wrongful incarceration.

24.     The government's findings and apologies helped transform the Japanese American experience from shame and guilt at being imprisoned, to hope and healing. Places of incarceration have now become hallowed ground, traditional cultural properties, and places for personal, national, and international remembrance. Governmental efforts to preserve and interpret Japanese American incarceration sites manifest a genuine national remorse at having stripped an innocent but unpopular racial minority of the rights, freedoms, and dignity that Americans cherish.

25.     The National Park Service educates the public on the nation's natural and human history.

5

VERIFIED COMPLAINT
*Tule Lake Committee v. Federal Aviation Administration*, United States District Court, Eastern District of California

Tasking the National Park Service with preserving and interpreting Tule Lake reaffirms the nation's promises of public education about the incarceration's history.

26.     Through pilgrimages to the incarceration sites, survivors and descendants of the incarceration seek healing, human connection, and connection to the history. Pilgrimages to Tule Lake began as solitary visits, with individuals seeking solace at the place that had caused them deep psychic wounds. Organized pilgrimages to Tule Lake now occur every two years, as four-day events that accommodate hundreds of pilgrims who come to honor the memory of those who were imprisoned and those who died there.

27.     In 1975 the State of California designated the Tule Lake concentration camp as a State Historic Landmark.

28.     The trauma experienced at Tule Lake makes this historic site hallowed ground to Americans, to Japanese Americans, and to survivors and descendants of survivors of incarceration there. Tule Lake's preservation is part of the healing that the government made possible when it acknowledged what President Reagan, in signing the Civil Liberties Act of 1988, described as "a great wrong."

29.     In 2006, a 37-acre portion of the camp's developed area was federally designated as the Tule Lake Segregation Center National Historic Landmark. A National Historic Landmark or "NHL" must have national historic significance; must "possess exceptional value or quality in illustrating or interpreting the heritage of the United States"; must retain a high degree of historic integrity; must be recommended by the National Park System Advisory Board; and may be designated only by the Secretary of the Interior. 36 C.F.R. § 65.4. Only about 2,500 sites have achieved this designation, including the 37-acre portion of the Tule Lake Segregation Center. The National Park Service manages this portion. In December 2008, President Bush created the WWII Valor in the Pacific National Monument, including a Tule Lake Unit, including the 37-acre portion.

30.     The Tule Lake concentration camp site is eligible for listing in the National Register of Historic Places (NRHP). In 2010 and 2011, FAA grants paid for consultant reports saying that the camp lands occupied by the airport were not eligible for listing in the NRHP. In March 2013 the FAA wrote to the State Historic Preservation Officer (SHPO) that "the remnants of the [Tule Lake Segregation Center] on the Airport property do not retain sufficient historic integrity to be eligible for the NRHP." In June

6

2013 the SHPO responded that "physical evidence allows the property to convey its significance, despite the loss of the buildings" and that "the Airport land could be found eligible." In December 2013 the FAA determined that "the Airport property is eligible under NRHP Criterion A (Event) as part of [a] larger historic district" and sought the SHPO's concurrence. In January 2014 the FAA agreed with the SHPO's suggestion that "the entire Indirect APE," a broader area including the airport property, "is eligible for listing on the NRHP." National Register eligibility triggers obligations under, among other laws, Sections 106 and 110 of the National Historic Preservation Act, and Cal. Gov. Code § 54221 in the California Surplus Land Act.

31.     A "traditional cultural property" (TCP) is described in the *National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties* (U.S. Dep't of Interior, National Park Serv., National Register of Historic Places, 1990; Revised 1992; 1998) as a property "eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." In July 2013 the Committee sent the FAA and the SHPO a statement by Janet P. Eidsness outlining the camp's significance as a TCP. In December 2013 the FAA wrote to the SHPO saying "the Tule Lake Committee did not clearly establish that a traditional cultural property with a distinct basis for NRHP eligibility … was present." The letter sought the SHPO's concurrence. In October 2016 the Federal Preservation Officer at FAA headquarters wrote to Thomas F. King, a nationally-recognized expert on Traditional Cultural Properties; her letter raised the subject of TCP and summarized the FAA's December 2013 assertion of ineligibility (citing *National Register Bulletin*). In November 2016 King replied asking for the FAA's reasoning. In August 2018 the FAA wrote to the SHPO disagreeing that visits and pilgrimages "that began well after closure of the TLSC … meet the characteristics of a TCP" (citing *National Register Bulletin*). In November 2018 the SHPO wrote the FAA saying that the FAA "provided no basis" for the decision that the camp does not qualify as a TCP and that there was "a strong case for considering the former Tule Lake Segregation Center a TCP…. Going forward, SHPO would like to understand the FAA's reasoning for discounting this aspect of the property."

32.     The Committee raised money to assist the Park Service's efforts to preserve the site and

tell its story. To date, the Committee has provided over $850,000 to help the Park Service with historic restoration projects. The Committee also advocates protecting the site from incompatible activities that threaten to destroy the site's historic fabric.

33.     In 2019 an Act of Congress elevated the Tule Lake Unit to the status of an independent National Monument, the Tule Lake National Monument.

## TULE LAKE COMMITTEE CEQA ACTIONS

34.     The following factual allegations relate to the Committee's two actions under the California Environmental Quality Act (CEQA). These suits were an exercise of the Committee's First Amendment right to petition for redress of grievances, and a motive for punitive measures against it.

35.     In 1974, City entered into a 40-year lease of the Tule Lake Municipal Airport property to Modoc County. The lease provides that it is "subject, however, to any and all terms, conditions, reservations or exceptions as more particularly set forth in the aforesaid patent." Lease at ¶ 1. In January 2014, Modoc County approved an "Addendum to Lease" extending the lease for 30 years until 2044. The extension occurred without environmental review.

36.     In July 2014, the Tule Lake Committee, through its attorney, Susan Brandt-Hawley, filed the first of two Petitions for Writ of Mandamus against the City of Tulelake, the County of Modoc, and others, commencing Case No. CU-14-104 (Superior Court, Modoc County). The petition, brought under CEQA, challenged the City's and the County's 2014 approval of the "Addendum to Lease."

37.     The basis for the challenge was the unsatisfied requirement of environmental review under CEQA. Factually, environmental review was needed because the County proposed a 5-year, $3.5 million construction program, to which the 2014 addendum to lease specifically referred. The construction program's expected environmental impacts included fencing the public out of the airport portion of the historic site. The petition prayed for a peremptory writ of mandamus setting aside the addendum to lease pending full compliance with CEQA.

38.     Subsequently, in November 2015, the City and the County approved a redrafted Addendum to Lease. Although the County still proposed the 5-year, $3.5 million construction program, the redrafted lease addendum dropped mention of that program. Again, City and the County approved the lease addendum without environmental review.

39.     On March 30, 2017, the Tule Lake Committee, through Ms. Brandt-Hawley, filed a second Petition for Writ of Mandamus against the City, the County, and others, commencing Case No. CU-17-079 (Superior Court, Modoc County). This petition challenged the November 2015 addendum to lease for lack of required environmental review under CEQA. It prayed for a peremptory writ of mandamus setting aside the 2015 addendum to lease pending full compliance with CEQA.

40.     The 2014 and 2017 CEQA actions remained pending until January 2019. At that time, negotiations to settle the actions failed to result in an agreement, and the Tule Lake Committee voluntarily dismissed both petitions without prejudice.

### THE COMMITTEE'S PROPOSAL TO RELOCATE THE AIRSTRIP

41.     The following factual allegations relate to the Committee's proposal to relocate the Tulelake Municipal Airport to a suitable non-historic site.

42.     Between 2016 and 2017, the Morris K. Udall and Stewart L. Udall Foundation staffed a series of meetings with stakeholders to discuss a perimeter fence for the airstrip and related questions.

43.     In those meetings, the Tule Lake Committee advocated (inter alia) consideration of alternatives to the fence that would preserve the historic site, including relocation of the airstrip. The FAA distributed to the attendees a document entitled "Sample Airport Relocation Process in California." In the FAA process, nine steps, including "open new airport and start operations," occur before the old airport is closed.

44.     The Tule Lake Committee has consistently relied on the FAA process as the Committee's proposed framework for relocating the airstrip.

45.     Certain attendees derided airstrip relocation as impossible or infeasible. On the contrary, airport relocation is a matter of public knowledge.

46.     The former U.S. Army Coast Defense Air Station, at Crissy Field in San Francisco, is an example of airport relocation. As visitors to the Crissy Field site are informed by a National Park Service interpretive sign, from 1921 to 1936, the coast defense air station "was at the forefront of military air operations." Interpretive sign, Exhibit B hereto. Around 1936, the air station was moved to a more suitable place. Since the move, the Crissy Field site has become part of a National Seashore administered by the National Park Service and visited by millions.

9

47.     Certain persons have said that airstrip relocation would permanently deprive the public and the economy of aviation services provided at the airstrip, e.g., crop-dusting.

48.     On the contrary, under the FAA process proposed by the Committee, the services provided by the airstrip would not be shut down until the services resume at a new location; thus, they would not end, nor would they even be interrupted, but they would instead be available continuously.

## TRANSFER ACTIONS BY CITY COUNCIL

49.     The following allegations relate to the transfer of City's interest in the Tulelake Municipal Airport land.

50.     Before or during 2018, the City Council of the City of Tulelake ("City Council") decided to transfer City's fee interest in the historic property underlying the Tulelake Municipal Airport to the Modoc Tribe of Oklahoma.

51.     The stated motive for the transfer was to end "this role of being the nominal owner of the piece of dirt under an airport that so far has gotten them sued a couple of times." See the oral staff report quoted below. As alleged above, the two previous lawsuits sought to protect the historic site against planned and anticipated activities that would compromise it.

52.     On November 7, 2017, City Council discussed hiring Michael Colantuono to represent City in negotiations with Tribe, among others.

53.     On January 26, 2018, the Committee wrote to City Council and Mayor Hank Ebinger expressing its interest in being considered as the airport's purchaser. The Committee's inquiry elicited no response.

54.     A month later, on February 28, 2018, the Committee re-emailed its letter expressing its interest in purchasing the airport. The Committee requested that its inquiry be acknowledged. City, through Mr. Colantuono, its sale negotiator, replied, "Your email is received. No decisions have been made." No further communications were received from City or its representatives responding to the Committee's early-2018 inquiries about purchasing the airport.

55.     On or about July 3, 2018, City proposed Ordinance No. 2018-16-01, to authorize the sale of the Tulelake airport land to the Modoc Tribe of Oklahoma for the figure of $17,500. The Ordinance claimed that the $17,500 sum was "fair consideration." Exhibit C hereto is a copy of the Ordinance.

56.     $17,500 for 359 acres amounts to less than $49 per acre.

57.     In a lawsuit by The Klamath Tribes to protect habitat for fish species sacred to it, on July 3, 2018, Tribe judicially admitted that in Modoc County "the price per acre of irrigable land is approximately $5,000."

58.     The airport structures add value to the land.

59.     On July 13, 2018, the Committee sent a letter to Mayor Ebinger and City Council offering to purchase the property for $40,000 cash.

60.     The Committee received no response from City to its offer letter of July 13, 2018.

61.     An attorney for the Committee emailed City's representative a letter on July 26, 2018. The letter re-offered the $40,000; covenanted to maintain the site as an airport; recited that the fee interest would be subject to the existing 1974 lease, as amended, and the two existing agreements with Macy's Flying Service; and recited that the Committee would dismiss the two CEQA actions forthwith and with prejudice. It also committed to consider any additional terms, and to be a cooperative and conscientious owner of the historic site.

62.     The Committee asked to be placed on the City Council agenda for July 31, 2018, to present and discuss its offer to purchase the airport.

63.     The City Council's public meeting on the proposed Ordinance for sale to Tribe took place at 5:30 PM on July 31, 2018. The Mayor announced a 3-minute time limit for speakers. The sale negotiator presented a brief oral statement self-characterized as a "staff report."

64.     A rough transcription of the sale negotiator's oral report is:

Good evening everyone. Michael Colantuono, I'm a local government lawyer, and the town has hired me to assist with this transaction, and so I'm giving what's in effect a staff report on this item. The town owns the land under the airport, because at the end of World War II the federal government gave it to the town conditioned that it used for an airport. And the title that the town holds provides that if it ever stops being an airport, the land goes back to Uncle Sam. The County of Modoc is the sponsor of the airport, that's a status under the FAA's rules, you need a Mother May I from the FAA to be a sponsor, and they are also the grant recipient with respect to the airport, which means they signed a contract by which they get to spend money from the FAA grant funds. You fly, you see that little $3 charge on your airline ticket. That money goes into a fund to maintain airports. That fund generates grants for all airports including airports like this one. So the County's a grant recipient. That's also a regulatory category with some obligations to Uncle Sam. The town is neither of those things. They just own the dirt. They have leased the dirt to the

County of Modoc; the County of Modoc is the airport sponsor, is the grant recipient, and it has subleased the field to a fixed base operator, FBO, Macy's Flying Services, which provides the economic activity that's actually using the airport. The airport is now on a lease that has another 24 years to go. Nobody can disturb that lease; the County's rights are good for another 24 years. Macy's has a sublease under that agreement. Nobody can disturb those rights. Those rights remain as well. The question is whether the town continues in this role of being the nominal owner of the piece of dirt under an airport that so far has gotten them sued a couple of times. So the transaction is proposed to sell that land to the Modoc Tribe of Oklahoma for $17,500. And people wonder, why that price, why so little, what's that about. That's basically my fees; it's covering the cost to close this deal so that the city can get out from under the burden of owning that land at no cost. If we made as a community a nickel on that transaction we'd be required to put the money back into the airport. We got the land from Uncle Sam for use as an airport, anything we make off of Uncle Sam's investment has to be used for airport uses. So there's no way for the town to sell it for more and to make more money for the community's general fund. One of the conditions of this sale if the town approves it, it's up to the City Council, is that the Modoc Tribe has to get the FAA's consent to the transaction, or has to prove to the city attorney's satisfaction that that's not required. That clause that says the City Attorney might decide it's not required is really about if the FAA refuses to exercise their jurisdiction. If they say you're not a grant sponsor, you're not an airport sponsor, you're not a grant recipient, and we don't have any relationship with you, and we're not going to do a Mother May I for you, then we're not going to get a Mother May I from them and the transaction can conclude. But unless they say that, we need their approval for the transaction and if we don't get it, the deal doesn't close on the terms that are in front of the Council tonight. It has to be used as an airport, under this deal and the underlying fee, and if that should cease to happen Uncle Sam gets the land back and we'll have to figure out what to use [sic] with it, and importantly to the community, another aspect of the agreement is that if the Modoc Tribe takes the land they have to defend and pay the lawyers for any lawsuits that the City might be involved in with respect to the airport going forward. After we released the agenda showing this transaction, we received two other offers, one from the Tule Lake Committee, which is essentially the same terms as the tribe with two differences, one is it's $40,000, and the other says no promise to indemnify but there is a promise to dismiss us from the existing lawsuit, which you might view as effectively the same thing. And we have an oral offer that's not been reduced to writing, from the County of Modoc, to match the terms that've been negotiated with the Tribe. We met in closed session earlier this evening, I provided a little bit of legal advice to the City Council about all three of those proposals, no action was taken because any action will be taken in open session after the Council hears from the public tonight. And with that, Mr. Mayor, Council members, that's all I have for you unless you have questions for me.

65.     No other information was presented about any criteria City would use to guide its decision over which offer, if any, to accept. The Mayor and City Council said nothing by way of deliberation. In particular, they failed to discuss the merits of the offers. With one exception, they asked nothing.

66.     The Committee made its allowed three-minute presentation. The Mayor and City Council

had no questions to the Committee and no comments concerning its offer.

67.     On information and belief, Modoc County had reached out to City to discuss purchase by the County, but City had not discussed the matter with the County. At the meeting, although representatives from the County attended, they made no presentation. The Mayor and City Council failed to ask them any questions, and failed to discuss the merits of the County's offer to match Tribe's offer. City Council voted unanimously for the pre-drawn Ordinance naming Tribe as purchaser.

68.     City's only questioning to any of the three parties proposing to purchase the airport was directed to Tribe. Mayor Hank Ebinger asked if Tribe could enlighten everyone on what sort of businesses it would bring into the area.  Blake Follis, Tribe's chief's grandson and spokesman, replied, "it's anything to support aviation."  He added, "The whole thing here, again, an airport the FAA requires you to have aviation-supportive businesses, so, that's indeed the type of enterprises that we look to help put in to the Tulelake Municipal Airport down there."

69.     Adding businesses in the airport (such as those alluded to in the preceding paragraph) should be studied with care, because, among other reasons, they could damage the historic resources.

70.     On July 31, 2018, City announced its decision to transfer the ownership interest in the historic property to Tribe for the sum of $17,500.

71.     By letter dated August 9, 1918, City wrote the Acting Manager, San Francisco Airports District Office, Western-Pacific Region, seeking FAA permission for the transfer. Although the letter said it enclosed a sale agreement, the letter as supplied to plaintiff by the FAA had no enclosure. A copy is Exhibit D hereto. Exhibit E hereto is a copy of the sale agreement as produced to plaintiff by City.

72.     By letter dated August 23, 2018, Brian Q. Armstrong, Manager, Airport Safety & Standards Branch, Western-Pacific Region, FAA, wrote City and Tribe saying the "FAA has reviewed the proposed Purchase Agreement to ensure it is consistent with the City's federal agreement obligations." The letter concluded that, with certain qualifications and conditions, "the FAA has no objection to the proposed Purchase Agreement of the Airport property from the City to the Tribe." A copy of the Armstrong letter is Exhibit F hereto.

73.     Nothing suggests that the FAA contemplates taking any further action following the Armstrong letter dated August 23, 2018.

74. The purported permission in the Armstrong letter was beyond Mr. Armstrong's authority.

75. By granting permission for the sale, the FAA violated its responsibilities to protect the federal investment in the nation's airports from unjust enrichment of Tribe.

76. By granting permission for the sale, the FAA violated its responsibilities to inform itself and others of damage to the historic property, and to protect the historic property from the damage.

## FIRST CAUSE OF ACTION

## NATIONAL HISTORIC PRESERVATION ACT AND ADMINISTRATIVE PROCEDURES ACT

77. The factual allegations in paragraphs 1 through 76 are here adopted by reference.

78. The airport property embraces historic properties within the meaning of 54 U.S.C. § 300308 in the National Historic Preservation Act ("NHPA").

79. City's ownership and proposed transfer of the airport property were undertakings carried out with Federal financial assistance within the meaning of 54 U.S.C. § 300320(2).

80. City's proposed transfer of the airport property was an undertaking requiring a Federal permit, license, or approval within the meaning of 54 U.S.C. § 300320(3).

81. The FAA's actions related to the airport and the transfer, and the letter dated August 23, 2018, constituted undertakings carried out by or on behalf of a Federal agency within the meaning of 54 U.S.C. § 30320(1).

82. Among other requirements, 54 U.S.C. § 306108 (NHPA § 106) requires that the head of a Federal agency, before issuing any license, first "shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306114 creates a nondelegable duty for the head of the agency to document any decision under section 306108 with respect to an undertaking that adversely affects any historic property for which a Federal agency has not entered into an agreement conforming to Council regulations. No federal agency has entered into such an agreement for this historic property. The FAA did not take into account the effect of the action of August 23, 2018, on the historic property, and the Administrator did not document the decision.

83. The FAA's actions or inactions failed to comply with the mandatory duties in 54 U.S.C. § 306102(b)(3) (NHPA § 110), requiring that the FAA's preservation program assure that "the preservation of property not under the jurisdiction or control of the agency but potentially affected by agency actions

14

is given full consideration in planning," and § 406203(b)(4), requiring consultation with "State … agencies" and the "private sector."

84.     The FAA's actions or inactions also failed to comply with the mandatory duties in 54 U.S.C. § 306107 (NHPA § 110(f)), requiring inter alia that the agency head determine, before approving any Federal undertaking, whether the undertaking "may directly and adversely affect any National Historic Landmark."

85.     Plaintiff is aggrieved by the FAA's actions or inactions related to the letter dated August 23, 2018, in that the FAA purported to permit, license, approve, or otherwise allow the sale of the historic property without the prerequisites required by the NHPA.

86.     Additionally, plaintiff is aggrieved within the meaning of 5 U.S.C. § 702 by the FAA's failure to act in that the FAA failed to observe the prerequisites required by the NHPA, and in that the FAA failed to take final agency action.

87.     Alternatively, if the FAA's action was within the mandates of the NHPA, it was arbitrary and capricious and was an abuse of discretion.

88.     Within the meaning of 5 U.S.C. §§ 702 and 704, there is no other adequate remedy in a court.

89.     The Committee has standing and an equitable interest in the protection of the historic site as a representative of those who were falsely imprisoned there, lived there, descended from there, wish to learn the history, or otherwise deserve the opportunity to visit and learn from the historic site.

90.     Plaintiff is entitled to judicial review under the Administrative Procedures Act.

91.     Plaintiff is entitled to an order compelling NHPA compliance unlawfully withheld or avoided.

92.     Plaintiff is entitled to an order vacating the FAA's action, and failures to act, as not in accordance with law and without observance of procedure required by law.

## SECOND CAUSE OF ACTION

### 1951 FEDERAL LAND PATENT AND ADMINISTRATIVE PROCEDURES ACT

93.     The factual allegations in paragraphs 1 through 76 are here adopted by reference.

94.     The United States made the Patent attached as Exhibit A "pursuant to the authority

15

contained in section 16 of the Federal Airport Act, approved May 13, 1946." The effect was to import any limits of authority from the Act into the Patent.

95.     Act Section 16(a) required that the Administrator of Civil Aeronautics determine that use of United States lands was "reasonably necessary for carrying out a project under this Act, or for the operation of [a] public airport." *Id.*

96.     Act Section 2(a)(8) defined "public airport" as "any airport which is used or to be used for public purposes, under the control of a public agency, the landing area of which is publicly owned." *Id.* Thus, the airports to be assisted under Section 16 were limited to those controlled by a public agency and with landing areas publicly owned.

97.     United States property could then be conveyed, but only "to the public agency sponsoring the project in question or owning or controlling the airport." *Id.*

98.     Act Section 2(a)(7) defined "public agency" as "the United States Government or an agency thereof; a State, the Territory of Alaska, the Territory of Hawaii, or Puerto Rico, or an agency of any of them; a municipality or other political subdivision; or a tax-supported organization." An Indian tribe is none of these and therefore is not a public agency within the meaning of the Act.

99.     Additionally, Tribe judicially admitted on December 6, 2019, in its Superior Court suit for attorney's fees against the Committee, that it is a Tribal governmental entity, not a public entity.

100.     The Patent provides that the lands conveyed by it will belong to City "and to its successors in function forever." *Id.* at 4.

101.     By acceptance of the patent, City "covenant[ed] and agree[d]" to bind "itself, and its successors in function, forever." *Id.* at page 5.

102.     The Patent required that "4. Any subsequent transfer of the property interest conveyed hereby will be made subject to all the covenants, conditions, and limitations contained in this instrument." *Id.* at 5.

103.     Among the covenants, conditions, and limitations contained in the Patent is the covenant and limitation that only City's "successors in function" can be transferees of the land.

104.     Tribe cannot be a "successor in function" to City, and therefore cannot be a transferee of the land.

16

105.     The sale agreement (Exhibit E) ignored the Patent's limitations on transfer when it said, "Seller is the owner of the Property and/or has the full right, power and authority as provided under California Government Code §§ 37440, *et seq.*, to sell convey and transfer the Property to Buyer as provided herein…." *Id.*, § 5.1(a).

106.     The Armstrong letter dated August 23, 2018 (Exhibit F) was legally insufficient in that it failed to enforce the Patent's "public agency" and "successor in function" covenants and limitations.

107.     Plaintiff is aggrieved by the action embodied in the letter dated August 23, 2018, in that the letter purported to grant City and Tribe a license for the sale of the historic property without determining that the purchaser was qualified to purchase the property as a "successor in function" within the meaning of the Patent.

108.     Plaintiff is aggrieved by the FAA's failure to act within the meaning of 5 U.S.C. § 702 in that the FAA failed to take final agency action.

109.     Within the meaning of 5 U.S.C. §§ 702 and 704, there is no other adequate remedy in a court.

110.     Plaintiff is entitled to judicial review under the Administrative Procedures Act.

111.     Plaintiff is entitled to an order vacating the Armstrong letter, and the FAA's action, and failures to act, as not in accordance with law.

112.     The Patent provides for reverter for a breach: "5. In the event of a breach of any condition or covenant herein imposed, the Administrator of Civil Aeronautics, or his successor in function, may immediately enter and possess himself of title to the herein-conveyed lands for an on behalf of the United States of America." *Id.* at 5.

113.     Because of the breach of the covenant and limitation that only City's successors in function may be transferees, title to the land should revert to the United States Department of the Interior.

### THIRD CAUSE OF ACTION

### CALIFORNIA SURPLUS LAND ACT

114.     The factual allegations in paragraphs 1 through 76 are here adopted by reference.

115.     This is a case of actual controversy within this Court's jurisdiction within the meaning of 28 U.S.C. § 2201. Plaintiff's interest and certain defendants' interests are adverse to one another, and

17

they disagree on the question presented under the Surplus Land Act.

116.    Cal. Gov. Code § 54220(b) (2018) declared the public policy of California "that surplus land, prior to disposition, should be made available for park and recreation purposes or for open-space purposes." Section 54222 required City, before disposing of the airport property, to issue written offers to sell to particular entities for park and recreational purposes or open-space purposes. City failed to make any such offers.

117.    City was a "local agency" within the meaning of Cal. Gov. Code § 54221(a).

118.    The fee interest in the airport property was "surplus land" within the meaning of Cal. Gov. Code § 54221(b) because it was owned by the City, and because the City had determined that that interest, and any property interest in the airport property, was no longer necessary for the City's use.

119.    Within the meaning of Cal. Gov. Code § 54221(f) and (f)(3), the fee interest in the airport property was subject to the provisions of Art. 8, Surplus Land. Because it was within 1,000 yards of property determined by the State Office of Historic Preservation to be eligible for the National Register of Historic Places, it was not "exempt surplus land." The airport property is and was situated within the County of Modoc within the meaning of Cal. Gov. Code § 54222(b)(2).

120.    Cal. Gov. Code § 54222(b) required that "any local agency disposing of surplus land shall, prior to disposing of that property, send a written offer to sell" as follows: "(b) A written offer to sell … for park and recreational purposes or open-space purposes … (2) To any park or recreation department of the county within which the land is situated…. (4) To the State Resources Agency or any agency which may succeed to its powers."

121.    City failed and refused to send the County of Modoc, before disposing of the property, a written offer to sell the property for park and recreational purposes or open-space purposes within the meaning of Cal. Gov. Code § 54222(b)(2).

122.    City failed and refused to send the California Resources Agency, now the California Natural Resources Agency, before disposing of the property, a written offer to sell the property for park and recreational purposes or open-space purposes within the meaning of Cal. Gov. Code § 54222(b)(4).

123.    City's transfer to Tribe violated Cal. Gov. Code § 54222.

\\\

18

# FOURTH CAUSE OF ACTION

## THE TRANSFER AGREEMENT CONTRAVENED PUBLIC POLICY

124.    The factual allegations in paragraphs 1 through 76, and 115 through 123, are here adopted by reference.

125.    The transfer agreement and transfer of the airport property contravened public policy in multiple areas.

### A.    California Open Space Policy

126.    Cal. Gov. Code § 54220(b) (2018) declared the public policy of California "that surplus land, prior to disposition, should be made available for park and recreation purposes or for open-space purposes."

127.    Under that public policy, Section 54222 required City, before disposing of the airport property, to issue written offers to sell to particular entities for park and recreational purposes or for open-space purposes.

128.    City failed and refused to make any such offers.

129.    Because City's transfer of the surplus airport violated the public policy of California, the property sale agreement was void ab initio.

### B.    Federal Policy Protecting Airport Investment

130.    Federal aviation policy calls for "protecting the federal investment in our nation's airports."[1]

131.    On information and belief, City, City Council, and Tribe failed to require, failed to generate, failed to receive, and failed to submit to the FAA, any documentation of the property's fair market value.

132.    Tribe judicially admitted in July 2018 that Modoc County irrigable land had a per-acre fair market value of $5,000. $5,000 is approximately one hundred times the airport property's $17,500 sale price, which, on a per-acre basis, was $49. Airport improvements add to the value of the subject property.

---

[1] Compliance Guidance Letter 2018-3, Appraisal Standards for the Sale and Disposal of Federally Obligated Airport Property, August 27, 2018, at page 1.

19

133.     At the meeting where City Council's sale decision was announced, City Council's sale negotiator admitted that the $17,500 figure was based solely on the amount of his own fees.

134.     City Council's sale negotiator further admitted: "If we made as a community a nickel on that transaction we'd be required to put the money back into the airport."

135.     By approving a sale for a price with no relationship to the land's fair market value, City, City Council, and Tribe proceeded without what the FAA has called "an integral and required component to establishing an objective marketable value and protecting the federal investment in our nation's airports."[2]

136.     By carrying out a sale with no relationship to fair market value, City, City Council, and Tribe caused the Modoc County airport system (and ultimately the United States) to be deprived of the land's fair market value, and unjustly enriched Tribe. This deprivation contravened federal aviation policy.

137.     The agreement by which the property was transferred was void ab initio as contrary to public policy.

### C.     Gift of Public Funds

138.     Cal. Const. Art. XVI § 6 effectuates a public policy of California against gifts of public funds or property: "The Legislature shall have no power … to authorize the giving or lending, of the credit of the State, or of any county … of any public money or thing of value to any individual, municipal or other corporation whatever; …"

139.     The historic site of the Tule Lake concentration camp is a thing of value within the meaning of Cal. Const. Art. XVI § 6.

140.     Additionally, aviation's interest in the excess of any proceeds over the negotiator's $17,500 fee is a thing of value.

141.     The constitutional prohibition applies to transfers done for private benefit.

142.     City's transfer of the historic property was done to benefit the private convenience of a businessman and hobbyist, and the private interest of a profit-making Tribe, at the expense of the

---

[2] *Id.*

County's airport system, the federal taxpayers, and the public educational and preservation interest in the historic property.

143. The transfer contravened California's public policy against gifts of public property.

144. The transfer was void ab initio.

## FIFTH CAUSE OF ACTION

### RALPH M. BROWN ACT

145. The factual allegations in paragraphs 1 through 76 are here adopted by reference.

146. By letter dated August 30, 2018, to Mayor Hank Ebinger, City Clerk Iva Rogers, and the Tulelake City Council, plaintiff satisfied the statutory prerequisites in Cal. Gov. Code § 54960.1 for action thereunder. There was no response to that letter. Exhibit G to this complaint is a copy of the letter dated August 30, 2018.

147. Plaintiff is entitled to bring this action under Cal. Gov. Code § 54960.1(a) "for the purpose of obtaining a judicial determination that an action taken by a legislative body of a local agency in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 is null and void under this section."

148. By letter dated August 30, 2018, to Mayor Hank Ebinger, City Clerk Iva Rogers, and the Tulelake City Council (Exhibit G, mentioned above), plaintiff satisfied the statutory prerequisites in Cal. Gov. Code § 54960.2 for action under Section 54960(a). There was no response to that letter.

149. Plaintiff is entitled to bring this action under Cal. Gov. Code § 54960(a) "to determine the applicability of this chapter to past actions of the legislative body."

150. Cal. Gov. Code § 54953(a) requires that "[a]ll meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter."

151. Cal. Gov. Code § 54957.7(a) requires that, "[p]rior to holding any closed session, the legislative body of the local agency shall disclose, in an open meeting, the item or items to be discussed in the closed session…. In the closed session, the legislative body may consider only those matters covered in its statement."

152. On November 7, 2017, at 5:30 PM, the City Council held a regular meeting that went

from open session to closed session at 6:04 PM, and returned to open session at 8:44 PM. The City Council Agenda stated the closed session's purpose as "conference with real property negotiators" about a "possible transfer of the Tulelake Airport, conditions, terms and price," citing Cal. Gov. Code § 54956.8.

153.     The provision cited by the City, Cal. Gov. Code § 54956.8, allows the agency "to grant authority to its negotiator regarding the price and terms of payment." Cal. Gov. Code § 54954.5(b) requires the agency to "[s]pecify whether instruction to negotiator will concern price, terms of payment, or both."

154.     The City Council's closed discussion of "conditions" of transfer exceeds price and terms of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

155.     The City Council's closed discussion of "terms" of transfer exceeds price and terms of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

156.     On February 6, 2018, at 5:30 PM, the City Council held a regular meeting that went from open session to closed session. The minutes reflect that the closed session was for "Conference with Real Property Negotiators Govt C 54956.8" and stated "Under negotiation: Possible transfer of the Tulelake Airport, conditions, terms and price. Discussion/action (Mayor Ebinger)."

157.     The City Council's closed discussion of "conditions" of transfer exceeds price and terms of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

158.     The City Council's closed discussion of "terms" of transfer exceeds price and terms of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

159.     On April 5, 2018, the City Council held a special meeting that went from open session to closed session at 6:05 PM for "conference with real property negotiators Govt C 54956.8." The minutes said, "Under negotiation: Update regarding negotiations with FAA regulations with possible transfer of the Tulelake Airport, conditions, terms and price." The closed session included the City Council and Finance Director Will Sargent. The closed session ended at 6:34 PM. After that, a "motion, made in closed session, to have the Attorney Michael Colantuono begin the negotiations for transfer of the Tulelake Airport," was approved.

160.     The City Council's closed discussion of "conditions" of transfer exceeds price and terms

22

of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

161.     The City Council's closed discussion of "terms" of transfer exceeds price and terms of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

162.     On May 1, 2018, the City Council held a regular meeting that went from open session to closed session at 7:09 PM for "conference with real property negotiators Govt C 54956.8." The minutes said, "Under negotiation: Update regarding negotiations with FAA regulations with possible transfer of the Tulelake Airport, conditions, terms and price." The closed session ended at 7:40 PM.

163.     The City Council's closed discussion of "conditions" of transfer exceeds price and terms of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

164.     The City Council's closed discussion of "terms" of transfer exceeds price and terms of payment and therefore violates Cal. Gov. Code §§ 54956.8 and 54954.5(b).

165.     On May 15, 2018, the City Council held a regular meeting in which Mayor Ebinger named "the negotiators as Will Sargent, Michael Colantuono and Mayor Ebinger with Council Member Fensler as an alternate." There was a "conference with real property negotiators for the possible transfer of the Tulelake Airport Govt C 54956.8." The minutes said, "Under negotiation: terms and price." The meeting went from open session to closed session at 6:45 PM, and returned from closed session at 7:14 PM.

166.     On information and belief, the City Council discussed matter beyond price and terms of payment in closed session and thereby violated the Brown Act.

167.     On June 19, 2018, the City Council held a regular meeting in which there was a "conference with real property negotiator(s) for the possible transfer of the Tulelake Airport. Govt C 54956.8." The minutes said, "Under negotiation: terms and price." The meeting went from open session to closed session at 6:58 PM, and returned from closed session at 7:32 PM.

168.     On information and belief, the City Council discussed matter beyond price and terms of payment in closed session and thereby violated the Brown Act.

169.     On July 31, 2018, at 4:15 PM, according to a City Council Agenda, the City Council held a meeting for "Conference with Real Property Negotiator(s) for the possible transfer of the Tulelake Airport. Govt C 54956.8." The Agenda listed negotiator names, property name, three offering parties,

23

and the subject matter: "Under Negotiation: Terms and Price."

170.     According to an email dated July 26, 2018, by Jenny Coelho, Tulelake City Hall Administrator, the 4:15 series of meetings was closed to the public. She wrote that the meeting noticed for 4:15 PM was "limited to a closed session."

171.     The same email emphasized the closed nature of the session by saying that "no public discussion of the airport sale … will be appropriate earlier than … 5:30 pm."

172.     The closed session without a prior open session violated Cal. Gov. Code § 54957.7(a).

173.     The discussion of terms of transfer exceeded the authorization in Section 54956.8 and Section 54954.5(b) for discussion of price and terms of payment. The closed session violated Cal. Gov. Code § 54953(a).

174.     At other relevant times, on information and belief, the City Council kept its dealings secret, violating the Brown Act.

175.     Plaintiff is entitled to a determination under Cal. Gov. Code § 54960(a) that past actions of the City Council violated the Brown Act, and to prospective relief to prevent future violations.

176.     Plaintiff is entitled to a determination under Cal. Gov. Code § 54960.1(a) that the City's sale decision, and the transfer stemming from it, are void ab initio.

## SIXTH CAUSE OF ACTION

## RACE; NATIONAL ORIGIN; PETITION FOR REDRESS OF GRIEVANCES

177.     The factual allegations in paragraphs 1 through 76 are here adopted by reference.

178.     City and City Council, which made or ratified the subject sale decision for City, are "persons" within the meaning of Section 1983. Each acted under color of state law.

179.     The Tule Lake survivors and descendants whom plaintiff represents are of Japanese ancestry and as such have been identified as a racial group. Plaintiff is publicly identified as an organization of Japanese Americans.

180.     Plaintiff is a "citizen of the United States," a person within the jurisdiction of the United States, and a person eligible for the protection of Sections 1981 and 1983.

181.     The right to petition the government for redress of grievances established by U.S. Const. Amend. I is a right, privilege, or immunity secured by the Constitution and laws within the meaning of

24

Section 1983. The right to sue, the right to be a party, the right to give evidence, and the right to the benefit of laws and proceedings as is enjoyed by white citizens, are protected by Section 1981.

182.     The right to be free from discrimination based on race or national origin is a right, privilege, or immunity secured by the Constitution and laws within the meaning of Section 1983.

183.     The right to due process of law is a right, privilege, or immunity secured by the Constitution and laws within the meaning of Section 1983.

184.     The right to be free from impairment of rights to contract, privilege, or immunity secured by the Constitution and laws within the meaning of Section 1983.

185.     This is an action at law, a suit in equity, or another proper proceeding for redress, within the meaning of Section 1983.

186.     City Council failed to deliberate publicly, or at all, on the relative merits of the purchase offers that were before it, and of no sale. In failing to deliberate, it impaired the rights of plaintiff to make contracts. It failed to deliberate on the legal requirements and public policies relating to offering City's surplus land to State and County entities.

187.     Plaintiff, and the persons whom it represents, have been the object of hostility and public vituperation in the Tulelake area because of their race and national origin, and because of plaintiff's initiation of the two abovementioned CEQA mandamus actions.

188.     City's and City Council's refusal to deliberate on the merits of no sale, sale to the County, sale to the State, or sale to the Committee, any of which might have served the public interest in preservation of the historic site, and their approval of the transfer to Tribe, resulted from improper animus against persons of Japanese ancestry and against the Committee based on race and national origin and based on the Committee's exercise of its constitutional right to petition for redress of grievances. These actions and omissions violated Sections 1981 and 1983.

189.     The City's and City Council's actions violated U.S. Const. Amends. I & XIV.

190.     Because those actions and omissions violated the rights of plaintiff and the persons it represents, they are entitled to relief under Sections 1981 and 1983.

## **JURY TRIAL DEMAND**

Plaintiff demands trial by jury of all jury-triable issues.

## PRAYERS

WHEREFORE, plaintiff prays for the following:

191.    For judicial review by this Court of the FAA's actions, errors, and failures to act embodied in its letter dated August 23, 2018.

192.    For an Order vacating the FAA's actions and failures to act as not in accordance with law, and as without observance of procedure required by law, particularly including but not limited to the APA and the NHPA, and vacating the attempted permission in FAA's letter dated August 23, 2018.

193.    For judicial review by this Court of City's and Tribe's actions, errors, and omissions regarding the attempted transfer and conveyance of the Tulelake Municipal Airport property.

194.    For an Order declaring City's attempted transfer and conveyance of the airport property to Tribe to be against public policy and void as a matter of law and equity.

195.    For an Order under the Brown Act, voiding City Council's decision to transfer the airport property and voiding the transfer.

196.    For an Order that City Council cease and desist from its unlawful secret proceedings, and keep audio or video recordings of its closed sessions.

197.    For damages according to proof.

198.    For costs, expenses, and reasonable attorney's and expert witnesses' fees under 42 U.S.C. §§ 1986, 1988; Cal. Gov. Code § 54960.5; Cal. Code Civ. Proc. § 1021.5; 54 U.S.C. § 307105; and any other statutes that may be applicable.

199.    For the Court to retain jurisdiction for implementation of corrective actions.

200.    For any additional relief that is lawful, equitable, and just.

Dated: April 2, 2020                                    Respectfully Submitted,

*/s/ Mark E. Merin*

By: _____
    Mark E. Merin
    Paul H. Masuhara
    LAW OFFICE OF MARK E. MERIN
    1010 F Street, Suite 300
    Sacramento, California 95814
    Telephone: (916) 443-6911
    Facsimile: (916) 447-8336

26

Respectfully Submitted,

*/s/ Yoshinori H. T. Himel*

By: _____
Yoshinori H. T. Himel
372 Florin Road #191
Sacramento, California 95831
Telephone: (916) 420-9865
Facsimile: (916) 229-9922

Attorneys for Plaintiff
TULE LAKE COMMITTEE

**VERIFIED COMPLAINT**
*Tule Lake Committee v. Federal Aviation Administration*, United States District Court, Eastern District of California

### **VERIFICATION**

Barbara Takei, under 28 U.S.C. § 1746(2), verifies:

As a member of the board of directors of the Tule Lake Committee, I verify that the facts contained within this Verified Complaint are true, except those facts asserted on information and belief, and as to those facts, I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct. Executed on April 2, 2020.


*/s/ Barbara Takei*
_____
Barbara Takei

# EXHIBIT A

Sacramento 042477 ADLm13H

## PATENT

THE UNITED STATES OF AMERICA, acting through the acting/Secretary
of the Interior, pursuant to the authority contained in section 16
of the Federal Airport Act, approved May 13, 1946 (60 Stat. 179;
49 U.S.C. 1115), hereby gives and grants a patent to the City of
Tulelake, State of California, and to its successors in function,
for the following-described lands:

> Lots thirteen and fifteen in section twenty-
> three; lot sixteen in section twenty-four;
> lots twenty-eight, twenty-nine, thirty-two,
> and the west half of the northwest quarter
> of section twenty-five; lots forty, forty-
> two and the northeast quarter of the north-
> east quarter of section twenty-six in town-
> ship forty-seven north of range five east
> of the Mount Diablo Meridian, California,
> containing 359.16 acres, according to the
> Official Plate of the Survey of the said
> lands on file in the Bureau of land Manage-
> ment, Department of the Interior.

There are hereby reserved from this patent for the use
of the United States all uranium, thorium, and all other materials
determined pursuant to paragraph (1) of section 5(b) of the
Atomic Energy Act of 1946 (60 Stat. 755, 761; 42 U.S.C. 1801)
to be peculiarly essential to the production of fissionable
material, whether or not of commercial value, in deposits in
the lands covered by this patent, together with the right of the
United States through its authorized agents or representatives at
any time to enter upon the lands and prospect for, mine, and
remove the same, making just compensation for any damage or injury
occasioned thereby. However, such lands may be used, and any
rights hereunder may be exercised, as if no reservation of such
materials had been made herein; except that, when such use results
in the extraction of any such material from the lands in quantities

113355-2

/

Sacramento 04:477 ADL:LEE

which may not be transferred or delivered without a license under
the provisions of the Atomic Energy Act of 1946, such material
shall be the property of the Atomic Energy Commission, and the
Commission may require delivery of such material to it by any
possessor thereof after such material is separated as such from
the ores in which it is contained. If the Commission requires the
delivery of such material to it, it shall pay to the person min-
ing or extracting the same, or to such other person as the Com-
mission determines to be entitled thereto, such sums, including
profits, as the Commission deems fair and reasonable for the dis-
covery, mining, development, production, extraction, and other
services performed with respect to such material prior to such
delivery, but such payment shall not include any amount on account
of the value of such material before removal from its place of
deposit in nature. If the Commission does not require delivery
of such material to it, the reservation hereby made shall be of
no further force or effect.

There are also excepted from this patent and reserved
to the United States all other minerals in the said lands, together
with the right of the United States through its authorized agents,
representatives, or lessees at any time to enter upon the lands
and prospect for, mine, and remove such minerals, in so far as
such right does not interfere with the development, operation,
and maintenance of the airport to be constructed upon the lands
by the said City of Tulelake, State of California, as determined
by the Secretary of the Interior and the Secretary of Commerce.

There is hereby reserved to the United States or to the
municipal authorities of any town site hereafter established pur-
suant to the act of April 16, 1906 (34 Stat. 116), or the act of
June 27, 1906 (34 Stat. 519), or hereafter established or set apart

1133552

2

Sacramento Ckght77 AZL:LEE

by proclamation of the President of the United States under
authority of Section 2305 or Section 2306, Revised Statutes of
the United States, the right to construct, erect, maintain, and
operate across the land conveyed hereby pipelines or water conduits
of any kind, transmission, telephone, or telegraph lines, sewers, or
other facilities or works of such character:  Provided, however,
That the City of Tulelake may require the United States or any
municipality exercising the rights reserved in this paragraph to
construct such facilities or works either underground or around
the land conveyed herein:  Provided, further, That the City of
Tulelake shall pay all excess costs incurred by reason of such
requirement and shall make available to the United States or any
municipality exercising such rights any land and interests in land
necessary to or occasioned by such requirements; it being understood
and agreed that the assumption by the City of Tulelake of the ob-
ligation to pay the excess costs so incurred, shall not operate
to bar the inclusion of the construction work represented by such
costs, or any part thereof, as airport development in a project
approved under the Federal Airport Act, or affect the allowability
of any costs incurred for such work as costs incurred in the
accomplishment of such project.

There is hereby reserved to the United States the right
of ingress and egress at all times to any of the property conveyed
hereby for the purpose of maintaining, repairing, operating, or
constructing any of the facilities or works now located or here-
after constructed on said land.

3

1133552

Sacramento 042477 AIL:1LSN

The City of Tulelake shall construct or cause to be constructed all changes to the present power system which supplies the present sewage disposal plants made necessary by this conveyance, and shall pay all costs incurred by reason of such construction, provided that the assumption by the City of Tulelake of the obligation to construct such changes and pay such costs shall not operate to bar the inclusion of such work, or any part thereof, as airport development in a project approved under the Federal Airport Act, or affect the allowability of any costs incurred by the City for such work as costs incurred in the accomplishment of such project.

TO HAVE AND TO HOLD the lands included in this patent, together with all rights, privileges, immunities, and appurtenances of whatsoever nature, thereunto belonging unto the said City of Tulelake, State of California, and to its successors in function forever; subject, however, to (1) any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, or decisions of the courts; and (2) a right-of-way for ditches or canals constructed under the authority of the United States as authorized by the act of August 30, 1890 (26 Stat. 391; 43 U.S.C. 945).

A

Sacramento 042477 ADL:LSH

The City of Tulelake, State of California, does by the
acceptance of this patent covenant and agree for itself, and its
successors in function, forever, as follows:

1. The property interest hereby conveyed shall automati-
cally revert to the United States pursuant to section 16 of the
Federal Airport Act, supra, in the event that the lands in ques-
tion are not developed, or cease to be used, for airport purposes;
and a determination by the Administrator of Civil Aeronautics,
United States Department of Commerce, or his successor in function,
that the lands have not been developed, or have ceased to be used,
for airport purposes shall be conclusive of such fact.

2. The City of Tulelake, State of California, will
develop an airport upon the lands herein conveyed.

3. Such airport will be operated as a public airport
upon fair and reasonable terms and without unjust discrimination.

4. Any subsequent transfer of the property interest
conveyed hereby will be made subject to all the covenants, con-
ditions, and limitations contained in this instrument.

5. In the event of a breach of any condition or cove-
nant herein imposed, the Administrator of Civil Aeronautics, or
his successor in function, may immediately enter and possess
himself of title to the herein-conveyed lands for and on behalf of
the United States of America.

6. In the event of a breach of any condition or covenant
herein imposed, the City of Tulelake, State of California, or its
successors in function, will, upon demand of the Administrator of
Civil Aeronautics, or his successor in function, take such action,
including the prosecution of suit, or execute such instruments, as
may be necessary or required to evidence transfer of title to the

5

1133552

Sacramento 04247 ADL:LXX

herein-conveyed lands to the United States of America.

IN TESTIMONY WHEREOF, the UNITED STATES OF AMERICA, by
its acting Secretary of the Interior, has hereunto subscribed its name
and affixed the seal of the United States Department of the
Interior, this __6th__ day of __August__, 1951.

UNITED STATES OF AMERICA

By R. D. Searles
Acting Secretary of the Interior

APPROVED this __19th__ day of __December__, 1951.

J. Howard McGrath
Attorney General, United States of America

APPROVED this __21st__ day of __December__, 1951.

Harry S. Truman
President, United States of America

Recorded: Patent Number 1133752

6

1133-5-52.



TOWNSHIP 47 NORTH RANGE 5 EAST OF THE MOUNT DIABLO MERIDIAN, CALIFORNIA

STATUS OF PUBLIC DOMAIN
LAND AND MINERAL TITLES

MTP
SUPPL Sec 25,26,35

MODOC COUNTY

BLM map
(lower portion
(section 25)

FEB 2 1982

# EXHIBIT B



## THE LAST WORD IN AIRFIELDS

### U.S. Army Coast Defense Air Station

From 1921 to 1936, Crissy Field was at the forefront of military air operations. Home of the U.S. Army Air Corps' Coast Defense Air Station, the site included a grassy landing strip and the barracks, offices and hangars that typified the era of barnstormers and biplanes.  Limited space for expansion and frequent fog eventually prompted the Air Corps to move north to Hamilton Field in Marin County.

*Text on right side of panel:*

Above: This is the earliest known photograph of Army flight operations at Crissy Field. In 1921, Marshal Ferdinand Foch, commander of the victorious allied armies in World War I, inspected this new installation and pronounced it, "The last word in airfields." Left: The Chief of the U.S. Army Air Service, Major General Mason Patrick (r), inspects the airfield.

# EXHIBIT C

## ORDINANCE NO. 2018-16-01

### AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF TULELAKE, CALIFORNIA, AUTHORIZING THE SALE OF THE LAND UNDERLYING TULELAKE MUNICIPAL AIRPORT TO THE MODOC TRIBE OF OKLAHOMA

**WHEREAS**, the City of Tulelake, California owns real property underlying what is commonly known as the Tulelake Municipal Airport, in Modoc County, California APN's 005-210-009 and 005-220-020; and,

**WHEREAS**, that Property was conveyed to the City of Tulelake in 1951 by the United States pursuant to United States Patent No. 1133552, which requires that the Property to be used as a public airport and provides that title in the Property shall revert to the United States should airport use cease; and

**WHEREAS,** the City has received an offer from the Modoc Tribe of Oklahoma, a federally-recognized tribe, of $17,500, to purchase the Property for use as a public airport; and

**WHEREAS,** California Government Code sections 37440 through 37444, inclusive, authorize the City, by ordinance adopted by four affirmative votes of its City Council, to sell the Property to a successor who will continue to use or allow the continued use of the Property as a public airport; and

**WHEREAS**, the City of Tulelake and the Modoc Tribe of Oklahoma (the "Parties") have negotiated the terms and conditions of the sale of the Property as set forth in the "Standard Offer and Agreement for Purchase of Real Estate (Non-Residential) (the "P&SA"), including that Buyer accepts title to the Property subject to the existing lease by and between the City of Tulelake and the County of Modoc dated October 1, 1974, as amended on February 11, 2016 and the Airport Operation and Maintenance Agreement by and between the County of Modoc and Nick S. Macy dated June 17, 1987, as amended ("Lease and Operating Agreements"), which agreements provide for the continued use and operation of the Property as a public airport; and

**WHEREAS**, the Buyer is obliged to obtain the consent of the Federal Aviation Administration to the transfer of the Property to Buyer as a condition to close of escrow; and

**WHEREAS**, the sale of the Property will not result in any significant changes to the character and use of the Property and therefore it is not a project with potential for causing either a direct physical change in the environment or a reasonably foreseeable indirect physical change in the environment that requires analysis under California Environmental Quality Act (CEQA).

**NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF TULELAKE THAT:**

**SECTION 1.**     Based upon the foregoing, the City Council finds:

1. The foregoing recitals are true and correct, and are incorporated herein by reference.

2. Notice of the July 31, 2018 City Council public meeting at which this Ordinance was considered for adoption was published in the **Herald and News** once a week for two successive weeks with at least five (5) days between publications.

195462.2

2

3. The sale and transfer of the land underlying the Tulelake Municipal Airport to the Modoc Tribe of Oklahoma achieves the City's purpose of continued operation of the property as a public airport. Moreover, the P&SA provides the City fair consideration for title encumbered by the federal patent and lease and operating agreements.

4. The sale of the property underlying the Tulelake Municipal Airport under the terms and conditions of the P&SA and as contemplated herein complies with California Government Code sections 37440 to 37444, inclusive, as the property will continue to be used as a public airport.

5. The sale of the Property is not a "project" within the meaning of Section 15378 of the State CEQA Guidelines, as it has no potential to result in a direct or reasonably foreseeable indirect physical change in the environment because only title to property will transfer. The property will continued to be used and maintained as it now is as a public airport under the lease and operative agreements identified above.

   **SECTION 2.**      The sale of the land underlying the Tulelake Municipal Airport as set forth in the attached P&SA is hereby approved, and the Mayor is hereby authorized to execute all necessary documents and take all actions necessary to complete that sale and transfer of the property.

   **SECTION 3.**      Should any section, clause, or provision of this Ordinance be declared by a court of competent jurisdiction to be invalid, the same shall not affect the validity of the Ordinance as a whole, or parts thereof, other than the part so declared to be invalid.

   **SECTION 4.**      This Ordinance shall take effect 30 days after its adoption pursuant to California Government Code Section 36937 and shall supersede any conflicting provision of any ordinance of the City.

   **SECTION 5.**      The City Clerk shall certify to the passage and adoption of this Ordinance and shall cause the same to be published or posted according to law.

   **PASSED, APPROVED AND ADOPTED** this 31th day of July, 2018.


_____

Henry A. Ebinger, Mayor

ATTEST:


_____

Iva Rogers, City Clerk


APPROVED AS TO FORM:


_____

Megan B. Annand
City Attorney

# EXHIBIT D



# CITY OF TULELAKE

591 Main Street
P. O. Box 847, Tulelake, CA  96134
Phone 530-667-5522 - FAX 530-667-5351
cityoftulelake@cot.net

| | |
|---|---|
| 600 | ✓ |
| 601 | |
| 602 | |
| 611 | |
| 612 | |
| 613 | |
| 614 | |
| 615 | |
| 617 | |
| 618 | |
| 619 | |
| 621 | |
| 622 | |
| 623 | |
| 624 | |
| 625 | |
| 626 | |
| 627 | |
| 628 | |
| 629 | |
| 630 | |

August 9, 2018

By Fax and US Mail
650 827-7634

Patrick Magnotta, Acting Manager
Federal Aviation Administration
San Francisco Airports District Office
Western Pacific Region
1000 Marina Blvd
Brisbane, CA 94005-1835



Re: Transfer of the Tulelake Airport from the City of Tulelake to the Modoc Tribe of Oklahoma

Dear Mr. Magnotta:

Attached please find the executed agreement between the City of Tulelake and the Modoc Tribe of Oklahoma to transfer the airport property from Tulelake to the Modocs.  The agreement is contingent upon FAA approval.  We hereby formally request that the FAA approve the transfer of the airport property from Tulelake to the Modoc Tribe of Oklahoma.  The Modoc Tribe of Oklahoma is represented in this transaction by Patrick Bergen who is copied on this letter.

Thank you for your cooperation.

Very truly yours,

Henry A. Ebinger
Mayor of the City of
Tulelake

cc by email:    Patrick Bergin, Esq. pbergin@ndnlaw.com (w attachment)
                Michael Colantuano, Esq.  mcolantuano@chwlaw.us (w attachment)
                Michael Alderdice, Esq.  mallderdice@b-alwa.com (w attachment)
                Megan Annand, Esq.  megan.annand@gmail.com (w attachment)

# EXHIBIT E

## STANDARD OFFER AND AGREEMENT FOR PURCHASE OF REAL ESTATE
### *(Non-Residential)*

Dated: July 31, 2018

### 1. Buyer.

1.1 **THE MODOC TRIBE OF OKLAHOMA**, a federally-recognized Indian tribe, (**"Buyer"**) hereby offers to purchase the real property, hereinafter described, from the owner thereof, the City of Tulelake, California (**"Seller"**) (collectively, the **"Parties"** or individually, a **"Party"**), upon the terms and conditions set forth in this agreement (**"Agreement"**).'

1.2 The term **"Date of Agreement"** as used herein shall be the date when by execution and delivery of this document or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase, the Property upon terms accepted by both Parties.

### 2. Property.

2.1 The real property (**"Property"**) that is the subject of this offer consists of an **airport and related facilities commonly known as the Tulelake Municipal Airport** located in Modoc County, State of California, and is commonly known by the street address of Tulelake Municipal Airport, Tulelake, California, 96134. The Property is legally described as: **Lots thirteen and fifteen in section twenty-three; lot sixteen in section twenty-four; lots twenty-eight, twenty-nine, thirty-two, and the west half of the northwest quarter of section twenty-five; lots forty, forty-two and the northeast quarter of the northeast quarter of section twenty-six in township forty-seven north of range five east of the Mount Diablo Meridian, California, containing 359.16 acres, according to the Official Plats of the Survey of the said lands on file in the Bureau of Land Management, Department of the Interior. (APN's: 005-210-009 and 005-220-020).**

2.2 If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be completed or corrected by the Parties.

2.3 The Property includes, at no additional cost to Buyer, the permanent improvements thereon, including those items which pursuant to applicable law are a part of the property (collectively, the **"Improvements"**).

2.4   Except as provided in Paragraph 2.3, the Purchase Price does not include Seller's personal property, furniture and furnishings.

### 3. Purchase Price.

3.1 The purchase price (**"Purchase Price"**) to be paid by Buyer to Seller for the Property shall be **$17,500.00**, payable on the Date of Agreement as follows:

(a) Cash payment consisting of the Purchase Price: **$17,500.00**

3.2   The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of

INITIAL

PAGE 1 OF 10

INITIAL

City  0000075

Hazardous Substances (as defined below). The determination of the existence of a Hazardous Substance condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Buyer and Seller. The Parties acknowledge that they have been advised to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on the Property or adjoining properties. Buyer hereby assumes all responsibility for the impact of such Hazardous Substances upon its interests herein. As used herein, "Hazardous Substance(s)" shall mean any substance, chemical, waste or material that is or becomes regulated by any federal, state or local governmental authority because of its toxicity, infectiousness, radioactivity, explosiveness, ignitability, corrosiveness or reactivity, including, without limitation, asbestos or any substance containing more than 0.1 percent asbestos, the group of compounds known as polychlorinated biphenyls, flammable explosives, oil, petroleum or any refined petroleum product.

3.3     AS-IS. BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS WITH ALL FAULTS" BASIS AND THAT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS OR BROKER AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION: (i) the quality, nature, adequacy and physical condition and aspects of the Property, (ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Property, (iv) the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, or the suitability, value or adequacy of the Property for any particular purpose, (v) the zoning or other legal status of the Property or any other public or private restrictions on use of the Property, (vi) the compliance of the Property with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity, (vii) the presence of Hazardous Substances on, under or about the Property or the adjoining or neighboring property, and (viii) the condition of title to the Property.

3.4     Environmental Disclosures. It is the Buyer's sole responsibility, at its expense, to determine the suitability of the Property for the proposed uses. If the structural or geological conditions of the Property, or any portion thereof, are not in all respects entirely suitable for the use or uses to which the Property will be put, then it is the obligation of Buyer to take such actions as may be necessary to place the Property in a condition entirely suitable for the development thereof. The Seller makes no representations or warranties as respects the suitability of the soils for the use or uses to which the Property will be put.

3.5     Natural Hazards Disclosures.     Without limiting Section 3.4, Seller and Buyer acknowledge that the Disclosure Statutes (as defined below) provide that a seller of real property must make certain disclosures regarding certain natural hazards potentially affecting the property, as more particularly provided in the Disclosure Statutes. As used in this Agreement, "Disclosure Statutes" means, collectively, California Government Code Sections 8589.3, 8589.4 and 51183.5, California Public Resources Code Sections 2621.9, 2694 and 4136 and any other California statutes that require a seller to make disclosures concerning the Property. Buyer acknowledges that it has received all natural hazard disclosure reports (the "Reports") required by the Disclosure Statutes.


INITIAL

INITIAL

Buyer hereby agrees as follows with respect to the Disclosure Statutes and the Reports:

a.    Buyer has received all Reports and they are hereby deemed to satisfy all obligations and requirements of Seller under the Disclosure Statutes.

b.    Buyer has had an opportunity to review all Reports and to investigate the disclosures and information.

c.    Seller shall not be liable for any error or inaccuracy in, or omission from, the information in the Reports.

d.    The Reports were provided by Seller for purposes of complying with the Disclosure Statutes and shall not be deemed to constitute a representation or warranty by Seller as to the presence or absence in, at or around the Property of the conditions that are the subject of the Disclosure Statutes.

3.6    Release.    Without limiting Sections 3.2 through 3.5, Buyer on behalf of itself and its successors and assigns waives its right to recover from, and forever releases and discharges Seller and Seller's affiliates, and the directors, officers, attorneys, employees and agents of each of them, and their respective successors and assigns, from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, costs or expenses whatsoever (including, without limitation, attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with the Property including, without limitation, the physical or environmental condition of the Property or any law or regulation applicable thereto. With respect to the waiver and release set forth herein relating to unknown and unsuspected claims, Buyer hereby acknowledges that such waiver and release is being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waiver, and that such waiver is made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

This Section 3.6 shall be effective as of the Date of Agreement.

3.7    This Agreement is contingent upon the issuance of a preliminary title report by Placer Title Company, 701 N. Main Street, Suite C, Alturas, CA 96101, and Buyer's satisfaction of said report, including exceptions, if any, listed therein. Buyer shall be responsible for the costs of obtaining said report.

**IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.**


INITIAL

PAGE 3 OF 10

<u>       </u>
INITIAL

4.    **Prorations and Adjustments.**

4.1 *Insurance.* **WARNING:** Any insurance which Seller may have maintained will terminate on the date of execution of this Agreement. Buyer is advised to obtain appropriate insurance to cover the Property.

4.2 *Rentals, Interest and Expenses.* Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of execution of this Agreement.

4.3 *Post Agreement Matters.* Any item to be prorated that is not determined or determinable at the date of execution of this Agreement shall be promptly adjusted by the Parties by appropriate cash payment when the amount due is determined.

5.    **Representations and Warranties of Seller and Disclaimers.**

5.1 Seller's warranties and representations shall survive the execution of this Agreement and delivery of the **Quitclaim Deed** for a period of 1 year, and any lawsuit or action based upon them must be commenced within such time period. Seller's warranties and representations are true, material and relied upon by Buyer in all respects. Seller hereby makes the following warranties and representations to Buyer:

(a) *Authority of Seller.* Seller is the owner of the Property and/or has the full right, power and authority as provided under California Government Code §§ 37440, *et seq.,* to sell convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

(b) *Changes in Agreements.* Prior to the execution of this Agreement, Seller will not amend any existing lease or other agreement affecting the Property, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(c) *Possessory Rights.* Seller has no knowledge without investigation or inquiry, that anyone will, at the execution of this Agreement, have any right to possession of the Property, except pursuant to the Lease dated October 1, 1974, as amended, between Seller and the County of Modoc, and the Airport Operation and Maintenance Agreement dated June 17, 1987, between the County of Modoc and Nick S. Macy, as amended, and as disclosed by this Agreement or otherwise in writing to Buyer.

(d) *Actions, Suits or Proceedings.* Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same, other than a lawsuit brought by the Tule Lake Committee against Modoc County and Seller.

(e) *Notice of Changes.* Seller will promptly notify Buyer in writing of any material change affecting the Property that becomes known to Seller prior to the execution of this Agreement.

As used herein, "knowledge" shall refer only to the actual knowledge of Seller's employee with responsibility for administering the Lease of the Property dated October 1, 1974, as amended, between Seller and Modoc County, and shall not be construed to refer to the knowledge of any other person or entity, or to impose or have imposed upon such party any duty to investigate the matters to which such knowledge, or the absence thereof, pertains, including, but not limited to, the contents of the files, documents and materials made available to or disclosed to Buyer or the contents of files maintained by such parties. There shall be no personal liability on the part of such party arising out of any of the Seller's warranties.


INITIAL

INITIAL

City 0000078

5.2 Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property. The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party, or relied upon by either Party hereto.

5.3 In the event that Buyer learns that a Seller representation or warranty might be untrue prior to the execution of this Agreement, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller regarding said representation or warranty.

## 6.    Possession.

Possession of the Property shall be given to Buyer upon execution of this Agreement and receipt by Seller of the Purchase Price, subject to the rights of tenants under existing leases and the terms and conditions of other agreements affecting the Property. As a condition precedent to the close of escrow and transfer of title to Buyer, on or before October 31, 2018, Buyer shall obtain written approval of the Federal Aviation Administration ("FAA") to the transfer of title and provide evidence of that approval to Seller in a form reasonably satisfactory to the City Attorney of Seller; provided, however, that the written approval of the FAA shall not be required prior to the close of escrow (or thereafter) if the City Attorney of Seller reasonably determines that the consent of the FAA is not required by law, and notifies Buyer in writing of such determination. If on or before October 31, 2018, Buyer has not obtained written approval of the FAA to the transfer of title and the City Attorney has not provided written notice to Buyer that written approval of the FAA is not required, then upon Buyer's written request Seller may, in its sole and absolute discretion, extend for a specified period of time, not to exceed ninety (90) days, the time for Buyer to obtain the written approval of the FAA to the transfer of title. If Buyer has not obtained the written approval of the FAA for the transfer by or before October 31, 2018 or by the last day of Seller's extension for Buyer to obtain written FAA approval in accordance with this Section, then upon written notice of termination by Seller to Buyer this Agreement shall terminate and be of no further force or effect, Buyer shall relinquish possession of the Property to Seller, and Seller shall refund the Purchase Price to Buyer. Upon either receipt of written approval from the FAA of the transfer within the time frame set forth in this Section, or receipt of City Attorney's written notice that written approval from the FAA is not required, Seller shall deliver to Buyer a fully executed quitclaim deed in recordable form conveying all of Seller's right, title and interest in the Property.

## 7.    Buyer's Entry.

At any time prior to the execution of this Agreement, Buyer has Seller's permission at reasonable times and subject to rights of tenants, to enter upon the Property for the purpose of making inspections and tests specified in this Agreement. No destructive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld. Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid

INITIAL

PAGE 5 OF 10

INITIAL

for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith. Prior to entry upon the Property to perform any tests or other work, Buyer shall deliver to Seller a certificate of insurance evidencing liability insurance of at least $2,000,000, naming Seller as an additional insured.

## 8.   Further Documents and Assurances.

The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to execute and effect this Agreement.

## 9.   Attorneys' Fees and costs.

9.1     The Purchase Price includes any and all attorney's fees or costs incurred by Seller in connection with the execution of this Agreement and the conveyance of Property to Buyer. Buyer shall not be responsible for any attorneys' fees or costs exceeding the amount of the Purchase Price.

9.2     If any Party brings an action or proceeding involving the Property, the Party that prevails ("Prevailing Party") in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees and costs. Such fees may be awarded in the same suit or recovered in a separate suit. The term **"Prevailing Party"** is the Party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party of its claim or defense. The attorneys' fees and costs shall be fully reimbursable irrespective of any court fee schedule.

## 10.  Prior Agreements/Amendments.

10.1   This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.

10.2   Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

## 11.  Notices.

11.1   Whenever Buyer or Seller shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Agreement or by facsimile transmission, electronic signature, digital signature, or email.

11.2   Service of any such communication shall be deemed made on the date of actual receipt if personally delivered, or transmitted by facsimile transmission, electronic signature, digital signature, or email. Any such communication sent by regular mail shall be deemed given five (5) days after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier. If such communication is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.


INITIAL

INITIAL

City 0000080

11.3   Any Party hereto may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

**12. Indemnity.**

12.1   In addition to any other indemnities herein, Buyer, as of the Date of Agreement, shall indemnify, defend and hold harmless Seller, its officers, employees and agents for, from and against any and all claims, actions, causes of action, fines, penalties and costs (including, without limitation, litigation related costs and expenses and attorneys' fees) (collectively "Claims") arising on or after the Date of Agreement, related to the Property, whether or not such Claims pertain to events, acts or failure to act prior to, on or after the Date of Agreement. This indemnity shall not apply to costs and expenses expressly to be borne by Seller pursuant to this Agreement.

**13.   Limited Waiver of Tribal Sovereign Immunity.**   BUYER HEREBY EXPRESSLY, UNEQUIVOCALLY AND IRREVOCABLY WAIVES ITS SOVEREIGN IMMUNITY (AND ANY DEFENSE BASED THEREON) FROM ANY SUIT IN A FORUM WITH COMPETENT JURISDICTION ARISING IN CONTRACT PROVIDED THAT: (i) THE SUIT IS BROUGHT BY SELLER AND (ii) THE SUIT ARISES UNDER THIS AGREEMENT.

13.1   **Limited Recourse.** THE RECOURSE AVAILABLE TO SELLER UNDER THIS LIMITED WAIVER OF SOVEREIGN IMMUNITY IS LIMITED TO PROVABLE DAMAGES OR EQUITABLE RELIEF ARISING UNDER THIS AGREEMENT AND IN NO EVENT SHALL INCLUDE PUNITIVE DAMAGES.   THE RECOURSE AVAILABLE TO SELLER FOR ANY MATTER OTHER THAN BUYER'S OBLIGATIONS TO INDEMNIFY SELLER AS CONTAINED IN THIS AGREEMENT IS FURTHER LIMITED TO: (i) DAMAGES CONSISTING OF THE TOTAL PURCHASE PRICE OF **$17,500.00**; AND (ii) THE MODOC TRIBE OF OKLAHOMA AND NO OTHER ENTITY WHOLLY-OWNED BY BUYER OR CREATED PURSUANT TO THE LAWS OF THE MODOC TRIBE OF OKLAHOMA.

13.2   **Waiver of Exhaustion of Tribal Court Remedies.** BUYER HEREBY EXPRESSLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY RIGHT SUCH IT MAY OTHERWISE HAVE TO REQUIRE THAT ANY ACTION DIRECTLY RELATED TO THIS AGREEMENT BE CONSIDERED OR HEARD IN ANY TRIBAL COURT OF BUYER, NOW OR HEREAFTER EXISTING, WHETHER BECAUSE OF THE DOCTRINE OF EXHAUSTION OF TRIBAL REMEDIES OR AS A MATTER OF COMITY OR ABSTENTION, AND WILL AGREE NOT TO COMMENCE ANY SUCH ACTION IN ANY TRIBAL COURT OF BUYER WITHOUT THE CONSENT OF SELLER TO SUCH ACTION. BUYER FURTHER AGREES THAT ANY ACTION FILED IN TRIBAL COURT OF BUYER WITHOUT THE CONSENT OF SELLER SHALL BE SUBJECT TO DISMISSAL AND/OR REMOVAL TO ANOTHER COURT OF COMPETENT JURISDICTION.

13.3   WITH RESPECT TO ANY CLAIM OR DISPUTE AND ANY RELIEF OF ANY NATURE RELATED TO SUCH A CLAIM OR DISPUTE, EACH PARTY HERETO SUBMITS TO THE JURISDICTION OF: (I) THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA, AND ANY COURT HAVING APPELLATE JURISDICTION THEREOF, AND (II) IF, AND ONLY IF, THE FEDERAL COURTS DETERMINE THAT THEY LACK JURISDICTION OVER ANY CLAIM ARISING HEREUNDER, THE SUPERIOR COURT IN AND FOR SISKIYOU COUNTY, CALIFORNIA, AND ANY COURT HAVING APPELLATE JURISDICTION THEREOF.

**14.   Modoc County Lease and Airport Operation and Maintenance Agreement.** Buyer hereby executes this Agreement and accepts title to the Property subject to the terms and conditions of the following existing leases and agreements:


INITIAL

INITIAL

City 0000081

14.1    That certain Lease by and between the City of Tulelake and the County of Modoc dated October 1, 1974, as amended by that certain Addendum to Lease dated February 11, 2016, concerning the lease of the Property to the County of Modoc; and

14.2    That certain Airport Operation and Maintenance Agreement by and between the County of Modoc and Nick S. Macy dated June 17, 1987, as amended.

14.3    Buyer acknowledges that the aforementioned Lease and Airport Operation and Maintenance Agreement under this paragraph 14 shall remain in full force and effect subsequent to the execution of this Agreement.

14.4    Buyer shall continue the current use of the property in accordance with the land patent, dated January 18, 1952, as amended.

15.    **Miscellaneous.**

15.1    **Binding Effect.** This Agreement shall be binding on the Parties without regard to whether or not paragraph 2 is initialed by both of the Parties.

15.2    **Applicable Law; Venue.** This Agreement shall be governed by the laws of California, the state in which the Property is located.

15.3    **Time of Essence.** Time is of the essence of this Agreement.

15.4    **Counterparts.** This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

15.5    **Waiver of Jury Trial.** TO THE EXTENT PERMITTED BY LAW, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

15.6    **Conflict.** Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions. <u>Seller and Buyer must initial any and all handwritten provisions.</u>

15.7    **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days.

15.8    **Confidential Information**: To the extent permitted by law, Buyer and Seller agree to keep confidential any communication or information provided by a Party that is considered by such Party to be confidential.

16.    **Construction of Agreement.** In construing this Agreement, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa.  This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

17.    Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum or addenda consisting of paragraphs through. (If there are no additional provisions write "NONE".)  NONE.

(Signature page follows)

_B__f_
INITIAL

PAGE 8 OF 10

_M_
INITIAL

City  0000082

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

Date: _____

**BUYER**

By: _____

Name Printed: _____ _BILL FOLLE_

Title: _____ _Chief_

Fax: _____ 918 542 5415

Email: _____ _modoc tribe @ cableone.net_

By: _____ _Modoc Tribe_

Name Printed: _____

Title: _____

Phone: _____ 918 542 1190

Fax: _____

Email: _____

Address: _____ 22 N. Eight Tribes Trail

(Signature pages continue)


INITIAL

PAGE 9 OF 10


INITIAL

City  0000083

Acceptance.

Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.

NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.

Date: _July 31, 2018_

**SELLER**

By: _____

Name Printed: _Henry A. Edinger_

Title: _Mayor_

Fax: _530-467-5351_

Email: _Cityoftulelake@cot.net_

Address: _PO Box 847, Tulelake, Ca. 96134_

_BF_
INITIAL

_MH_
INITIAL

City 0000084

# EXHIBIT F

U.S. Department
of Transportation

**Federal Aviation
Administration**

Western-Pacific Region
Office of Airports
Safety and Standards Branch

777 S. Aviation Blvd., Suite #150
El Segundo, CA  90245

August 23, 2018

The Honorable Henry A. Ebinger
Mayor
City of Tulelake
591 Main Street
P.O. Box 847
Tulelake, CA  96134

Mr. Patrick Bergin, Esq.
Fredericks Peebles & Morgan, LLP
c/o Modoc Tribe of Oklahoma
2020 L Street, Suite 250
Sacramento, CA 95811

Dear Mayor Ebinger and Mr. Bergin:

Thank you for your August 9th letter to the Federal Aviation Administration (FAA) about the proposed sale of the Tulelake Municipal Airport (Airport) by the City of Tulelake, California (City) to the Modoc Tribe of Oklahoma (Tribe).  The FAA has reviewed the proposed Purchase Agreement to ensure it is consistent with the City's federal agreement obligations.

The City's federal agreement obligations for the Airport are set forth in the land grant patent, recorded with the Bureau of Land Management on February 28, 1952.  This land grant patent transferred the airport property from the Federal Government to the City.  Among other obligations, the land grant patent specifies, ***"Any subsequent transfer of the property interest conveyed hereby will be made subject to all the covenants, conditions, and limitations contained in this instrument."*** (Land Patent, p. 5, ¶ 4.) The Purchase Agreement requires, "Buyer shall continue the current use of the property in accordance with the land patent dated January 18, 1952." Therefore, the Tribe should understand and accept all obligations and commitments of the land grant patent before executing the purchase.

Since 1974, the City has leased the airport to the County of Modoc, California (County).  The terms of that lease, as amended, extend to September 30, 2044.  Based on that lease and its extension, the FAA has provided the County with federal financial assistance under the Airport Improvement Program (AIP) to improve the Airport.  All AIP grants contain terms and conditions obligating the County as sponsor of the AIP grants.  Those terms and conditions are known as the Airport Grant Assurances.  The proposed Purchase Agreement between the City and Tribe is subject to the current lease between the City and the County and the Purchase Agreement acknowledges this condition.  Therefore, we expect the County to continue to operate the Airport, as it has in the past, for the duration of that lease and to continue to act as the sponsor for past and future federal grants.  The Tribe should commit to assuming responsibility for the operation of the Airport and assumption of obligations under the grant

assurances applicable to the Airport, in the event that the County's lease is terminated.  The Tribe should not take any action(s) that would limit or restrict the County's ability to meet its federal agreement obligations under the Airport Grant Assurances.  If the County, as the sponsor, or Tribe, as owner, fail to abide by the grant obligations or do not use the property for airport purposes, then the subject property may be reverted to the Federal Government pursuant to the land patent. (Land Patent, p. 5, ¶1.)

Based on this information and the conditions specified above, the FAA has no objection to the proposed Purchase Agreement of the Airport property from the City to the Tribe.

This letter represents the present views of the FAA's Regional Airports Division Office based on the facts presented in your submissions. This response does not constitute a final agency action or an "order issued by the Secretary of Transportation" under Title 49, United States Code, § 46110.

I trust that this information is helpful.  If you have any questions or should the terms of the agreements or your request change, please contact our San Francisco Airports District Office at 650-827-7601.  Please also provide my office with copies of the signed and executed agreements and other ownership change documents.

Sincerely,

Brian Q. Armstrong
Manager, Airport Safety & Standards Branch
Western-Pacific Region

cc:      County of Modoc

         Yoshinori H.T. Himel
         372 Florin Road, #191
         Sacramento, CA 95831

# EXHIBIT G



August 30, 2018

Via U.S. Mail
and Facsimile, to 530-667-5361

Mayor Hank Ebinger
City Clerk Iva Rogers
Tulelake City Council
591 Main Street
Tulelake, CA  96134

Dear Mayor Ebinger, City Clerk Rogers, and Tulelake City Council members:

I write under two provisions of the Ralph M. Brown Act, Cal. Gov. Code sections 54960.1 and 54960.2, to request that you cure or correct, by rescinding, your decision announced July 31, 2018, to sell the land underlying the Tulelake Airport to the Modoc Tribe of Oklahoma; and that you cease and desist from closed session discussion of topics not authorized by Sections 54954.5(b) and 54956.8.

In January of 2018, the Tule Lake Committee learned by reading the City Council's minutes of November 7, 2017, posted on the City's website, that the city planned to hire attorney Michael Colantuono to represent the City in negotiations with "the Modoc of Oklahoma, Macy's Flying Service, Modoc County."

On January 26, 2018, the Committee wrote to you, stating our interest as a potential buyer, given that "the Tulelake airport occupies a significant part of the historic WWII Tule Lake concentration camp site, which is of immense importance to Japanese Americans."  The letter, sent by postal service and email, asked to participate further in these discussions. The Committee received no response.

Because we did not receive a response from the City, the Committee followed up one month later.  On February 28, 2018, the Committee re-emailed its letter expressing, once again, the desire to be considered as a buyer for the airport.

The City-appointed real estate negotiator, Michael Colantuono, replied to us via email, stating, "Your email is received. No decisions have been made."

Months went by with no communication from Tulelake's City Council or its representatives.

BOARD of DIRECTORS
Chair, Hiroshi Shimizu
CFO, Barbara Takei
Secretary, Ken Nomiyama
Roy Ikeda
Satsuki Ina
Stan Shikuma

City Council meeting minutes show discussion of a potential Tulelake airport transfer in closed sessions, citing Cal. Gov. Code section 54956.8.  The meeting Minutes dated 5-15-2018 and 6-19-2018 reported, "Negotiating Parties: Modoc Tribe of Oklahoma" and "Under Negotiation: Terms and Price."

The July 3, 2018 Minutes, which were not posted until late August, reported a proposed Ordinance approving sale of the land to the Modoc of Oklahoma and a reading of the Ordinance.

The Committee was alarmed to learn on July 12, 2018, from an unofficial source, that despite expression of our interest in purchasing the land underlying the airport, on July 3, 2018, the City had proposed Ordinance No. 2018-16-01. The Ordinance would authorize the sale of the land underlying Tulelake Municipal airport to the Modoc Tribe of Oklahoma for the surprisingly low figure of $17,500. That day, on July 12, the Committee sent a letter to Mayor Ebinger and the City Council, offering the City $40,000 to purchase the airport property. No acknowledgment or response from the City was received.

An attorney for the Committee then emailed a letter to the City's negotiator on July 26, 2018, that offered:

- to pay $40,000 for the airport property,
- to maintain the airport site as an airport,
- to accept the lease between the City of Tulelake and Modoc County,
- to accept the Operation and Maintenance Agreement between Modoc County and Macy's Flying Service, and
- to dismiss the City of Tulelake from the pending CEQA mandamus actions and to waive costs of the suit.

The City's negotiator acknowledged receipt of the Committee's offer via our attorney.

To get our offer to purchase the Tulelake airport to be discussed by the City Council and the property negotiator, I called the City of Tulelake to ask if it was permissible to send a request by email to be placed on the July 31st meeting agenda.  I was assured this was possible.

However, after emailing the Committee's request to be included on the 4:15 PM Agenda, we received a reply from the City Hall Administrator, Jenny Coelho, who explained that it would not be "appropriate" to "separately agendize" our offer as the City would not discuss the airport sale before the 5:30 meeting.

Ms. Coelho's emailed response to the Committee is quoted below with emphasis added:

"It will **not be necessary or appropriate to separately agendize your proposal for that sale**. You will have opportunity to speak in the hearing. If you have a proposal to present, you may wish to submit it in writing to our attorney, Mr. Colantuono, in advance of the meeting to ensure the Council and its legal counsel are able to review it fully.

**"There will be a special meeting at 4:15 pm before the regular meeting at 5:30 pm for which the possible sale is noticed. If so, that meeting will be limited to a closed session.** While public comment before the closed session will of course be welcome **no public discussion of the airport sale by the City Council will be appropriate earlier than the time of which the City has given published notice of 5:30 pm**."

The Tule Lake Committee understood the administrator's communication to mean that we were not to participate in this closed meeting where the City Council would discuss the "terms and price" of the airport sale.

According to the Minutes of that meeting that began at 4:27 PM, the Mayor took nine minutes to discuss purchase of two "Toughbook tablets," taking zero comments from the public, and read the Agenda Item 5, "Conference with Real Property Negotiator(s) for the possible transfer of the Tulelake Airport." The City listed the negotiating parties as the "Modoc Tribe of Oklahoma; the Tule Lake Committee and the County of Modoc," noting they would again, as on May 15 and June 19, be discussing "Terms and Price." The meeting was then closed at 4:36 PM for a discussion with the City's airport property negotiators that lasted 35 minutes.

Because Modoc County was described as not submitting a written offer, and the Tule Lake Committee had been excluded from any negotiations, it was unclear what these negotiations over terms and price would cover, since the Ordinance discussed only one buyer, the Modoc Tribe of Oklahoma, and the price and other terms of the Tribe's purchase.

The public meeting to deliberate and act on the proposed Ordinance for sale to the Tribe took place at 5:30 PM on July 31, 2018. At the outset of this public meeting, the Mayor announced a 3-minute time limit for those wishing to address the City Council. Consequently, the meeting was not a forum for an interactive discussion of the relative merits of the offers from the airport land's three "negotiating parties" designated in the previous meeting: the Modoc tribe, the Tule Lake Committee, and Modoc County.

Mr. Colantuono, as negotiator for the City, gave an oral "staff report." He outlined some terms of the City's fee ownership, except that he never mentioned the site's historic importance. Instead, he referred to the site as a "piece of dirt under an airport." He outlined the Tribe's $17,500 offer,

characterized it as "the terms that've been negotiated with the Tribe," and compared the terms offered by the Committee and by the County. He defended the low dollar amount as being enough to pay his own fee to "close this deal," and said that if the City made "a nickel on that transaction" the amount would go "back into the airport" since "anything we make off of Uncle Sam's investment has to be used for airport use."

No other information was presented about any criteria the City would use to guide its decision over which offer, if any, to accept. The Mayor and City Council said nothing by way of deliberation, and they asked almost nothing. In particular, they (unlike Mr. Colantuono) utterly failed to mention the substance, let alone the comparative merits, of the offers.

The Committee made its three-minute presentation. The Mayor and City Council had no questions to the Committee and no comments concerning its offer.

According to the oral staff report, the County had made an oral offer to match the purchase offer made by the Modoc Tribe of Oklahoma. At the meeting, although representatives from the County attended, the Mayor and City Council failed to ask them any questions, and failed to discuss the merits of the County's offer to match the Tribe's offer. The City Council voted unanimously for the pre-drawn Ordinance naming the Tribe.

The City Council's closed meetings violate the open meeting command of the Brown Act. It is in those closed meetings that the Council had to have discussed, if it ever discussed, the terms on which it ultimately sold the historic land. Those terms, according to the Ordinance, include valuation, indemnification, future airport use, and price. Of these topics, several exceed the topics authorized by Brown Act sections 54954.5(b) and 54956.8.

The repetitive nature of the closed meetings with unlawful discussion suggest a continuing practice from the which the Council should cease and desist.

For these reasons, the City Council should cure or correct, by rescinding its decision announced July 31, 2018, to sell the land underlying the Tulelake Airport to the Modoc Tribe of Oklahoma; and it should cease and desist from closed session discussion of topics not authorized by Sections 54954.5(b) and 54956.8.


Barbara Takei
On behalf of the Tule Lake Committee